975 So.2d 726 (2008)
Shameka WILEY and Jasmine Wiley, individually and on behalf of Donna Wiley, Plaintiff-Appellee
v.
John M. LIPKA, M.D., Defendant-Appellant.
No. 42,794-CA.
Court of Appeal of Louisiana, Second Circuit.
February 6, 2008.
*727 Weil & Arceneaux by Richard L. Weil, Gerald F. Arceneaux, for Appellant, John M. Lipka, M.D.
Hudson, Potts & Bernstein, L.L.P. by Jay P. Adams, Gordon L. James, Monroe, for Appellant, State of La. Patient's Compensation Fund.
The Cochran Law Firm, Phillips and Mitchell, by Deborah E. Lavender, for Appellees.
Before STEWART, GASKINS and MOORE, JJ.
MOORE, J.
This is an appeal from a judgment against Dr. John M. Lipka for medical malpractice that resulted in the death of Donna Wiley on December 20, 2001. The decedent's two daughters, Shameka and Jasmine, brought a survival and wrongful *728 death action alleging Dr. Lipka breached the standard of care in treating their mother. This core issue is whether Dr. Lipka breached the applicable standard of medical care in his response to complications arising out of an operation he performed on Ms. Wiley on December 4, 2001. For the reasons stated herein, we affirm.

Facts
The matters of record reveal that on November 30, 2001, Donna Wiley, age 34, presented at the emergency room of Morehouse General Hospital in Bastrop, Louisiana, complaining of abdominal pain, vomiting blood and passing blood from the bowel. Dr. Lipka performed an endoscopy and discovered a large broad-based ulcer with multiple bleeding points in the duodenum. In the anatomy of the digestive system, the duodenum[1] is a hollow jointed tube about 25-30 cm long (10 to 12 inches) connecting the stomach to the jejunum or small intestines. It is the first and shortest part of the small intestine, and it is where most chemical digestion takes place. A duodenal ulcer is a raw area in the duodenum caused when the lining is eaten away by stomach acid and digestive juices.[2]
Dr. Lipka brought the bleeding under control using an Argon Laser Coagulator. Ms. Wiley was admitted to ICU and given two units of blood. She recovered over the next three days.
Ms. Wiley had undergone a previous surgical procedure, a vagotomy and pyloroplasty, for her ulcer disease. A vagotomy is a way to reduce the acidity in the stomach by cutting the vagus nerves to the stomach that trigger the production of acid. Because this procedure has an effect on the function of the pyloris, a sphincter muscle that controls the outlet from the stomach to the duodenum, the pyloris is also cut.
After the episode of November 30, 2001, Dr. Lipka consulted with Ms. Wiley regarding further surgical intervention to prevent another recurrence of the bleeding *729 ulcer problem. This was apparently the third episode of bleeding ulcers she had experienced. Dr. Lipka was concerned because the presence of a Lewis antibody in Ms. Wiley's blood coupled with her ongoing problems with bleeding constituted a dangerous combination. The presence of a Lewis antibody made it difficult to locally find matching blood for a transfusion and required them to obtain matching blood from Shreveport and beyond.
The surgical procedure Dr. Lipka recommended entailed a 70% gastrectomy/antrectomy, vagotomy and Bilroth II gastrojejunostomy. The gastrectomy or antrectomy would consist of surgical removal of the lower 70% of the stomach. The Billroth II involved attaching the remaining part of the stomach to the jejunum, that is, the portion of the small intestine after the duodenum. The duodenum, that part of the intestine between the stomach and the jejunum, is not removed since the organ is necessary to handle bile and pancreatic juices flowing into it through the bile duct and which would continue to flow from the duodenum into the jejunum. However, since the upper end of the duodenum is no longer attached to the stomach, it must be closed off by sutures, thereby creating a duodenal stump. This is important because the ultimate issue in this case is whether Ms. Wiley died as a result of Dr. Lipka's breach of the standard of care regarding recognition and treatment of a duodenal stump leak as a complication of the surgery.
On December 4, Dr. Lipka performed the procedure described above at Morehouse General Hospital. After the surgery, she was placed in ICU to proceed toward a normal course of recovery. Ms. Wiley never recovered from the surgery; indeed, sixteen days after the operation, on December 20, 2001, Ms. Wiley went into unresuscitatable shock and died.
The plaintiffs requested that the matter be submitted to a Medical Review Panel ("MRP") on June 11, 2002. Subsequently, an MRP was ordered to be convened by the Patient's Compensation Fund Oversight Board. The panel issued the following terse opinion finding that Dr. Lipka did not breach the applicable standard of care:
On the 1st day of November, 2004, the Medical Review Panel composed of Edward B. Staudinger, M.D., Vincent R. Russo, M.D. and James T. Tebbe, Jr., M.D., failed to meet the applicable standard of care as charged in the complaint.
Dr. Webb appropriately and timely attended to the medical conditions of this patient, within the scope of his general practice. Dr. Lipka addressed and treated the patient's surgical conditions in a timely fashion. Dr. Lipka addressed the patient's 1) general condition, i.e., nutritional status, volume status, hydration and feeding; 2) the infection by ordering antibiotic therapy; and 3) he drained the abscess percutaneously and ordered a follow-up CAT scan.
Plaintiffs then brought suit, which ultimately went to trial, submitting into evidence the trial depositions of two medical experts who reviewed the medical records in this case, Dr. Brent Miedema, a general surgeon and Dr. Stanley A. Nasraway, Jr., an intensivist, or expert in intensive care. The defendant, Dr. Lipka, presented his own testimony and that of Dr. Brenton Wayne McDonald, a radiologist. The evidentiary record also contains the hospital medical records of Ms. Wiley.
After a bench trial, the trial court rendered judgment in favor of the plaintiffs and awarded $500,000 in damages, plus *730 judicial interest from June 11, 2002. Defendant appealed.
The trial court issued its Reasons for Judgment, but, like the MRP opinion, it did not set forth a section of "Facts" in the opinion. Rather, the trial court simply repeats the "Contentions of the Plaintiffs," followed by summaries of the expert testimony of Drs. Miedema and Nasraway, and the MRP conclusions. The trial court next concluded that the weight of the testimony given by plaintiffs' experts far outweighed the findings of the defense experts. Accordingly, we conclude that the trial court must have adopted the factual contentions of the plaintiffs and the expert testimony of Drs. Miedema and Nasraway.
Our review of the entire record, including testimony and medical records of Dr. Lipka, the nurses' notes and plaintiffs' experts' testimony reveal little or no disagreement regarding the events constituting the post-operative facts in this case. That is, there is no dispute over the day-to-day post-operative reports of the recovery progression of Ms. Wiley as reflected in Dr. Lipka's notes and the nurses' notes. The disagreement in this case concerns what these notes reveal about Ms. Wiley's condition and Dr. Lipka's interpretation and response to the symptoms exhibited by Ms. Wiley.
Dr. Lipka's notes indicate that Ms. Wiley's recovery was slow, and that she appeared to be hampered by a persistent fever, peritonitis[3] and sepsis,[4] the source of which Dr. Lipka was unable to ascertain with certainty through blood and radiological tests. Ms. Wiley also experienced tachycardia and tachypnea during the first week after the surgery. Her blood chemistry showed fluctuation and was slightly improving but still showed elevated white blood cell counts and elevated bandemia (immature white blood cells). Nevertheless, according to Dr. Lipka's notes seven days after surgery, she appeared to have turned the corner toward recovery, although she continued to have fever and had a terrible surgical wound that was not healing. Dr. Lipka's testimony indicates that he believed that this was partially due to lack of nursing skill in wound care of this type. She was moved from the ICU to the floor. Over the next few days, however, her condition again appeared to worsen in some respects, while some clinical signs indicated improvement.
Dr. Lipka testified from his notes that on December 12, he felt she was doing better. Although her fever was 102 degrees, she had taken some food. Her surgical wound was not granulating, however, which meant it was not healing. Her liver function was normal, so that organ was not the source of her elevated bilirubin.
On December 13 (post-op day 9), Dr. Lipka's notes indicate that the wound had some cloudy fluid and that it was granulating at the edges. He testified that it was significant that there was no fluid from the JP drain, which was located at the anastomosis (the place where the stomach now joined the intestine), and if there had been a leak from the suture lines there, one would expect to have seen fluids coming from the JP drain. He suspected that there was a subphrenic abscess[5] due to the collection of fluid in the lower abdomen. His suspicion was confirmed that day by an abdominal CT scan that indicated a fairly significant subphrenic collection of fluid above and along the right side of the liver. He testified that if the fluid had *731 been below the liver he would have suspected a leak.
On December 14, the subphrenic abscess was drained via CT guidance. Interpreting his handwritten notes at trial, Dr. Lipka said that Ms. Wiley (who had a history of asthma) continued to hear crackles in her lungs. She was not tachycardic and her heart rate was 92. Her wound was granulating, indicating that it was beginning to heal. Although she continued to have a large number of bands in her white blood cell count, that could be explained by the abscess that had just been drained and would take time to normalize. A blood culture showed two types of bacteria: gram negative rods and gram positive cocci. He said she was receiving appropriate antibiotics.
On December 15, Dr. Lipka's notes indicate that Ms. Wiley was feeling better. Her bowel was functioning. His impression was that she continued to be septic and had increased or elevated "bili" (bilirubin). Her wound was granulating and the output from her drain was decreasing.
Although he noted on December 16 that Ms. Wiley said she felt better, she had a fever of 103 degrees the evening before. He also noted that she had significant drainage from the tube draining the subphrenic abscess. He ordered an upper GI series. The upper GI performed the following day, December 17 (post-op day 13), yielded "no evidence of extravasation."[6] Dr. Lipka wrote that he believed that Ms. Wiley was improving slowly. His notes also indicate that he discussed the case with L.W. Johnson[7] and thereafter read: "  feel like she is sick, subphrenic abscess, may have Duodenal stump fistula. Will treat with drainage. Repeat CT. . . ." The notes of Dr. Lipka's visit on December 18 indicate that Ms. Wiley continued to have a fever, noted to be 102 degrees.
On December 19, Ms. Wiley's condition rapidly worsened. Dr. Lipka dictated notes twice on the afternoon of the nineteenth. The first set indicates that Ms. Wiley was comatose and in critical condition. The outlook was extremely dismal. Dr. Lipka suspected that she had undergone some kind of transfusion reaction unrelated to her recovery from the surgery. He initiated contact with Ms. Wiley's family and told them of the seriousness of the situation.
Dr. Lipka dictated additional notes that afternoon and evening. Those notes state that while Ms. Wiley's condition since the surgery had continued to clinically improve in terms of white blood cell count, ambulating and tolerating a diet, her fever persisted and the pigtail catheter continued to drain the subphrenic abscess. She had exudative[8] material in her wound. The repeat CT scan showed no evidence of new fluid collection. Her ESR[9] was elevated at 57. SLE[10] was positive undilated. She had been receiving TPN,[11] which he noted might be the source of sepsis, in order to *732 give her gut a rest due to the question of a duodenal stump leak. He noted, however, that a stump leak could not be demonstrated radiographically with the repeat CT scan and upper GI.
Dr. Lipka stated in his notes that he was called about 6:25 that morning (December 19) and informed that Ms. Wiley's blood pressure had dropped. Thinking that this might be a septic complication, he ordered one liter of saline to be given to her. Subsequently, a large amount of bloody material came from her free peritoneal space. Dr. Lipka believed that Ms. Wiley was having a chronic reaction to the blood products they had given her because she had a known Lewis antibody to blood products for which they had given her steroids. This might also have been partly the source of her fever, the continued dropping of her hemoglobin and her elevated bilirubin. However, he noted that they were forced to give her blood cells. He believed that the large amount of blood coming from her midline wound (from her surgery) indicated to him that Ms. Wiley was having a coagulopathic hemorrhage as an infusion reaction to the hemoglobin.
Ms. Wiley was transferred to the intensive care unit. She had decreasing blood pressure and lost her pulse. She was revived and had a second similar episode. She became tachycardic. She was receiving high dosages of norepinephrine and dopamine to keep her pressure up. Dr. Lipka stated in his notes that Ms. Wiley's prognosis was grave. He did not expect her to survive and thought she might have brain injury. He also noted that she was not a candidate for a surgical procedure and he still believed that she did not need a surgical procedure. She had a drained abscess. He stated that she had some type of either septic or hematologic event that caused her to go into a state of unresuscitative shock.
At 5:10 p.m. on December 19, 2001, Dr. Lipka noted that Ms. Wiley remained comatose, and he could not elicit any neurological activity. He noted that her pattern was that of a DIC.[12] He stated that he firmly believed that there was some autoimmune process that was hereditary in nature that led to her condition, the catalyst being unknown, possibly an endotoxin from one of the infections. He stated he did not believe she would survive the night.
Dr. Lipka's notes state that tests later confirmed that Ms. Wiley was having a DIC. He obtained a DNR (acronym for DO NOT RESUSCITATE) directive from the family. Ms. Wiley died at 9:30 a.m. on December 20, 2001.
At trial he said that "ultimately what her demises [sic] was sepsis went from compensated to uncompensated sepsis and she went into unresuscitatable shock and expired."

DR. MIEDEMA'S TESTIMONY
Dr. Miedema testified for the plaintiffs as an expert in general surgery. He stated that he had reviewed the hospital records on Ms. Wiley, Dr. Lipka's depositions, the evidence submitted to the MRP, discovery responses and other material.
In Dr. Miedema's opinion, on approximately December 11th or 12th, 2001, Ms. Wiley's elevated white blood cell count, fever and drainage of bile material from her surgical wound indicated that she had developed a duodenal stump leak. This is *733 a known complication that occurs when the line of sutures break down. It is the most common cause of death in these patients. When this occurred, he said, the bile and pancreatic secretions were going into Ms. Wiley's abdomen, rather than staying in her gastrointestinal tract. He stated that Dr. Lipka recognized this when he ordered the CT scan on December 13 in response to the fluid collection in Ms. Wiley's abdomen. Dr. Miedema felt that the drainage of this subphrenic abscess on December 14 was appropriate treatment.
However, relying largely on lab reports and on the notes of nurses attending to Ms. Wiley, Dr. Miedema concluded that Ms. Wiley did not improve after the drainage of the abscess. He stated that her white blood cell count continued to remain high and she continued to have fever. Her bowels stopped working and she began vomiting. The wound continued to drain bile. She had ongoing peritonitis that was causing sepsis. He said it was legitimate to treat a duodenal stump leak with drainage and antibiotics as long as the patient is getting better. However, as in the case of Ms. Wiley, when the patient does not get better or begins to deteriorate, then an operation is mandatory. He stated that this is where the negligence in this case occurred. He stated his opinion that had a re-operation been performed, the fistula or stump leak could have been controlled with tubes and drains, and Ms. Wiley would have survived.
Dr. Miedema explained that peritonitis is simply an inflammation of the peritoneum, the inner lining of the abdomen and the lining over the intestines and intra-abdominal organs. This inflammation is caused by bacteria, bile or pancreatic fluid and causes abdominal pain. If it is not controlled, it usually gets infected with bacteria and leads to bacteria getting into the bloodstream causing sepsis, which leads to problems throughout the body and can cause death.
According to Dr. Miedema, the most common cause of subphrenic fluid is a duodenal stump leak, although it is possible for an abscess without a duodenal leak. It is important to note that Dr. Miedema recognized that Dr. Lipka was looking for evidence of a duodenal fistula or leakage at the anastomosis by ordering the subsequent upper GI series and repeat CT scans with contrast. He opined that the failure of these tests to reveal leakage was not conclusive. In his opinion, surgery was required to discover the source.
Dr. Miedema testified that he reviewed the nurse records and that those records support the conclusion that the probable cause of Ms. Wiley's subphrenic fluid was a duodenal stump leak. These records revealed that Ms. Wiley was leaking a light-greenish fluid from the wound that was consistent with the color of bile and a stump leak. Ms. Wiley continued to have fever and abdominal distention consistent with peritonitis. Additionally, she was having trouble breathing, which is also consistent with peritonitis, inasmuch as it makes it painful to breathe deeply. He also noted that Ms. Wiley was being given two drugs to promote urination, whereas the peritonitis was causing a decrease in urination.
The nurse records of December 16 indicated that a sage-green drainage saturated the wound dressing and that there was a dull red drainage from the CT drain. This green drainage indicated to Dr. Miedema that the bile fluid was entering into the peritoneal cavity and coming out the abdominal wound. He opined that if the percutaneous drain that was placed to drain the abscess fluid was draining everything, then there would be nothing coming out of the abdominal wound. Instead, the percutaneous drain (CT tube) was draining *734 only some bloody fluids, while the wound was draining green and yellow bile fluids, indicating to him that it was likely a duodenal stump leak as the source of the biliary fluids.
Dr. Miedema noted that the nurse records of December 17 reveal that Ms. Wiley continued to have fever and vomited a yellow, foul-smelling, cottage cheese-like fluid material. The percutaneous (CT) tube was now draining a brown fluid, which, along with Ms. Wiley's distended abdomen, indicated to Dr. Miedema that the bile fluids were making their way downward. The foul-smelling fluids indicated an infection and are a known indicator in the natural history of peritonitis.
Dr. Miedema testified that by December 17, all these factors  elevated white blood cell count, fever, tachycardia, bile draining out of the abdominal wound, vomiting and bowels not working and abdominal distention  indicated that Ms. Wiley had ongoing uncontrolled peritonitis and a reasonably competent surgeon should have operated at this point.
On December 18, Ms. Wiley's condition continued to worsen. Dr. Miedema said that her elevated blood sugar indicated sepsis. Additionally, her tachypnea indicated sepsis. He stated that Ms. Wiley was now showing signs of severe sepsis and her only chance of survival was another operation. Ms. Wiley was actively bleeding at this point, which Dr. Miedema said was because severe sepsis causes the coagulation factors in blood not to work. This resulted in bleeding from Ms. Wiley's surgery wounds. Ms. Wiley subsequently went into shock, suffered the hypotensive events described above, and died.

DR. NASRAWAY'S TESTIMONY
Dr. Stanley Nasraway also testified for the plaintiffs. He stated that most surgical patients who die in intensive care die from sepsis. Dr. Nasraway stated that soon after the surgery on December 4, Ms. Wiley began to develop fever and abdominal pain. This became particularly manifest around December 11. Dr. Lipka undertook a CT scan to identify a right subphrenic abscess  an abscess around the liver and the diaphragm, not far from the site of the surgery, and subsequently drained the abscess. However, Ms. Wiley continued to demonstrate an ongoing sepsis by having nausea and vomiting periodically. He noted that Dr. Lipka, in trying to understand this, undertook an upper GI series and a repeat CT scan with contrast on the 17th and 18th of December, respectively. Dr. Nasraway believed that these studies were incomplete, but Dr. Lipka, nevertheless, concluded that there was no need for further surgery. Ms. Wiley's condition profoundly deteriorated on the morning of December 19, sustained cardiac arrest that morning as she was being transferred to intensive care and died within 24 hours thereafter.
Dr. Nasraway's opinion regarding the need for Dr. Lipka to re-operate is essentially the same as that of Dr. Miedema. He also testified regarding the sources and treatment of infection. He stated that surgery is often the source of infection, because with surgery, there is the possibility of sutures coming undone in the peritoneal cavity at the anastomosis or at other suture lines. There is also the possibility of accidental perforation of the bowel missed during the surgery. He agreed with Dr. Lipka's initial choice of draining the abscess with the catheter. However, Dr. Nasraway testified that Dr. Lipka breached the standard of care first by not re-opening Ms. Wiley, and then by ordering ineffective antibiotics to fight an intraabdominal infection. The antibiotics that Dr. Lipka ordered, according to Dr. Nasraway, do not cover anaerobes and they do *735 not cover other bacteria like enterococcus, typical of intra-abdominal infections, and which, in fact, grew from cultures of Ms. Wiley's abdominal drainage from the subphrenic abscess. He further testified that Dr. Lipka breached the standard of care by insufficiently monitoring her and by not bringing in consults.
Having summarized the facts and opinions from the trial record, we turn now to the appellant's assignments of error.

Discussion
The manifest error standard applies to our review of medical malpractice cases. Jackson v. Tulane Medical Center Hosp. and Clinic, 05-1594 (La.10/17/06), 942 So.2d 509; Wilhite v. Thompson, 42,395 (La.App. 2 Cir. 8/15/07), 962 So.2d 493. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646; Stobart, supra. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, (La.4/3/02), 816 So.2d 270. "The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." Stobart, supra at 882.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra. Although the standard of review is high, it does not require this court to abdicate its responsibility to review the trial court's findings, nor does it require this court to affirm a verdict that is manifestly erroneous. Gordon v. Willis-Knighton Medical Center, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, writs denied, 95-2776 and 95-2783 (La.1/26/96), 666 So.2d 679. Where the fact finder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.
The plaintiff bears the burden of proving that a doctor committed malpractice. Dr. Lipka practices in the specialty of general surgery. According to La. R.S. 9:2794(A), any medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant's standard of care; (2) the defendant's breach of that standard of care; and (3) a causal connection between the breach and the claimant's injuries. Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94), 643 So.2d 1228.
In this appeal, Dr. Lipka alleges a single assignment of error; namely, that the trial court erred in finding that the plaintiffs carried their burden of proving that he breached the standard of care for general surgeons in this case. Specifically, he argues that Donna Wiley suffered a known complication of the procedure to which she consented; that there was no *736 medical evidence to demonstrate that Ms. Wiley suffered from a duodenum stump leak; that the medical records reflect that his choice of antibiotic coverage was appropriate; and that Ms. Wiley suffered a sudden hypotensive event and his treatment was appropriate.
We note at the outset that the trial court misstated the law regarding the necessity of expert opinions in all medical malpractice actions, citing Frasier v. Department of Health and Human Resources, 500 So.2d 858 (La.App. 1 Cir.1986). The Louisiana Supreme Court in Pfiffner v. Correa, supra, held that expert opinion testimony is not always necessary in a medical malpractice case.[13] However, this misstatement is of no consequence in this case.
Turning now to defendant's first argument that the complications Ms. Wiley suffered were a known risk from the surgery, the plaintiffs' general surgery expert, Dr. Miedema, testified that a duodenal stump leak is a known complication from the surgery and that it can be fatal. Dr. Miedema clearly testified that he did not believe that Dr. Lipka breached a standard of care in the surgery that led to the duodenal stump leak since it is a known complication. Rather, he testified that Dr. Lipka breached the standard of care in his response to indications of continued duodenal stump leakage. Simply stated, Dr. Miedema testified that Dr. Lipka responded appropriately when the initial CT scan revealed the subphrenic accumulation of fluid in Ms. Wiley's abdomen by draining the fluid percutaneously. However, he opined that Dr. Lipka breached the standard of care when he did not re-open Ms. Lipka and gain control of the duodenal stump leakage after she did not improve, and she continued to show signs of an uncontrolled leakage of bilious fluid in her abdomen.
Dr. Lipka contends, however, that there is no medical evidence that Ms. Wiley suffered from a duodenal stump leak. Our review of the record reveals otherwise. We observe that Dr. Lipka's own notes on December 17, 2001, 13 days after the surgery, indicate that he discussed the case with L.W. Johnson and wrote: " feel like she is sick, subphrenic abscess, may have Duodenal stump fistula. Will treat with drainage. Repeat CT. . . ." We note also that Dr. Lipka's earlier notes on December 15 indicated his concern with elevated "bili" and he noted that it would be "difficult to do ERCP[14], HIDA[15] scan will *737 not differentiate between duodenal stump and bile duct."
Dr. Miedema testified that at this point, in view of the ongoing sepsis, Dr. Lipka departed from the standard of care. In his opinion, the evidence, although indirect, pointed to an uncontrolled duodenal stump leak or leakage from some other point in the GI tract that was not discovered by the CT scans or upper GI.
Accordingly, we find no error in the trial court's acceptance of Dr. Miedema's opinion and the conclusion that Dr. Lipka breached the standard of care in this case when he failed to re-operate on Ms. Wiley to determine the source of the subphrenic fluids.
Appellant next argues that the trial court erred in finding that the antibiotic treatment coverage was not appropriate. As recounted in the facts above, Dr. Nasraway testified that the antibiotics used by Dr. Lipka did not cover two commonly found forms of bacteria in the abdomen in a patient suffering from peritonitis. On the other hand, Dr. Miedema expressed no concern over the antibiotics ordered by Dr. Lipka, and the physicians on the MRP found that Dr. Lipka did not breach the standard of care when he addressed the situation by ordering antibiotic therapy and drained the abscess percutaneously.
Even when an appellate court might have ruled differently, there is no manifest error in the trial court's finding if the trial court's decision to give greater weight to one expert over others is not unreasonable. In this instance, we cannot say the trial court manifestly erred in this regard. Accordingly, this assignment is without merit.
Finally, defendant argues that Ms. Wiley suffered a sudden hypotensive event and this is what actually led to her death. Our review of the record indicates that there is no disagreement among the experts over the fact that a sudden hypotensive event, or several, ultimately led to Ms. Wiley's death. However, our review of the record supports the trial court's conclusion that the hypotensive events she suffered had a cause, and that the cause was an ongoing sepsis caused by peritonitis that more likely than not resulted from the leakage of biliary fluids from the duodenal stump or possibly the anastomosis that was not brought under control due to Dr. Lipka's failure to re-operate.

Conclusion
After reviewing the record in its entirety, we hold that the trial court was not manifestly erroneous in finding that the plaintiffs proved by a preponderance of the evidence that Dr. Lipka breached the standard of care for general surgeons in his post-operative medical treatment of Donna Wiley. The expert testimony presented by plaintiffs indicates that this conclusion was reasonable. The court was presented with differing views of the evidence regarding the post-operative complications suffered by Ms. Wiley. Thus, the trial court's decision to credit the opinions of the plaintiffs' experts is not manifestly erroneous.
For these reasons, the judgment of the trial court is affirmed. Costs of appeal are to be paid by the defendant.
AFFIRMED.
NOTES
[1] "Duodenum" comes from the Latin phrase, duodenum digitalis, which means "twelve finger-widths," referring to the length of this part of the organ.
[2] Plaintiff's expert, Dr. Miedema, testified that most ulcers are caused by the H. Pylori bacteria and can be treated with antibiotics. However, this was not the case with Ms. Wiley. In her case, tests did not show the presence of the bacteria, which indicated that her ulcers were due to excess acid.
[3] Inflammation of the organs in the abdomen.
[4] Infection in the blood.
[5] A subphrenic abscess is an abscess below the diaphragm. It is a known complication of abdominal surgery.
[6] Literally, leakage of fluid from a container. In this case, he is likely referring to no evidence of leakage from the duodenum or the area of the anastomsis.
[7] L.W. Johnson is the chief of surgery at E.A. Conway Hospital.
[8] Fluid such as pus.
[9] ESR stands for erythrocyte sedimentation rate. It is a nonspecific screening test that indirectly measures how much inflammation is in the body.
[10] SLE (lupus) is an autoimmune disease. This means there is a problem with the body's normal immune system response.
[11] Total parenteral nutrition (TPN) is a method of feeding that bypasses the gastrointestinal tract.
[12] Disseminated intravascular coagulation (DIC) is a serious disorder in which the proteins that control blood clotting are abnormally active. Small blood clots form throughout the body. Over time, the clotting proteins become "used up" and can result in clots or, more often, bleeding. Bleeding can be severe.
[13] The court recognized several situations where expert testimony is not always needed:

Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence. Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician's fault. Likewise, where the defendant/physician testifies as to the standard of care and his breach thereof, or the alleged negligence consists of violating a statute and/or the hospital's bylaws, (violation of LSA-R.S. 40:2113.4 which imposes a duty on a hospital to make emergency services available to all persons in the community without regard to income or insurance protection and hospital bylaws establishing duties for on-call physicians), expert testimony is also unnecessary to establish a malpractice claim. Pfiffner at 1233-34 (citations omitted).
[14] ERCP (Endoscopic Retrograde Cholangiopancreatography) combines the use of x rays and an endoscope to diagnose and treat conditions of the bile ducts, including, among other things, leaks from trauma and surgery. Through the endoscope, the physician can see the inside of the stomach and duodenum, and inject dyes into the ducts in the biliary tree and pancreas so they can be seen on x rays.
[15] An HIDA scan involves injecting a dye or other chemical (radioactive tracer) into a vein whereby the tracer travels to the liver and then into the bile ducts. It is also used, among other things, to diagnose bile leaks.