998 So.2d 233 (2008)
Hazel M. WYATT, Individually and on Behalf of William H. Wyatt (D), Plaintiff-Appellant,
v.
Ricky D. HENDRIX, M.D. and Louisiana Medical Mutual Insurance Company, Defendants-Appellees.
No. 43,559-CA.
Court of Appeal of Louisiana, Second Circuit.
November 5, 2008.
*237 Charles S. Norris, Jr., Alicia R. Hoover, Baton Rouge, for Appellant.
Lawrence W. Pettiette, Jr., Joseph S. Woodley, Shreveport, for Appellees.
Before BROWN, WILLIAMS and MOORE, JJ.
WILLIAMS, J.
In this medical malpractice action, plaintiff, Hazel M. Wyatt, the surviving spouse of William H. Wyatt, appeals a jury's verdict finding that plaintiff failed to prove the applicable standard of care. The trial court signed a judgment in accordance with the jury's verdict, dismissing plaintiff's claims against defendants, Ricky D. Hendrix, M.D., and his medical insurer, Louisiana Medical Mutual Insurance Company. For the reasons set forth herein, we affirm the judgment of the trial court.

FACTS
On August 27, 2001, William Wyatt went to the emergency room at the Winn Parish Medical Center, complaining of left-sided chest wall pain. Mr. Wyatt indicated to the emergency room staff that his symptoms had begun approximately two to three weeks previously and seemed to *238 worsen with deep breathing.[1] A chest x-ray revealed infiltrates in the base of Mr. Wyatt's left lung. Mr. Wyatt did not have a treating physician, so he was assigned to the on-call physician, Dr. Ricky Hendrix, an internal medicine physician. The emergency room physician and Dr. Hendrix spoke via telephone and agreed upon a plan of care for Mr. Wyatt, which included admission to the hospital. The emergency room physician wrote orders to admit Mr. Wyatt to the hospital with a diagnosis of pneumonia. The orders included, inter alia, Lovenox 30mg (a blood thinner), to be administered by subcutaneous injection two times a day.
Dr. Hendrix examined Mr. Wyatt the following day. An admission history dictated by Dr. Hendrix indicated that Mr. Wyatt provided Dr. Hendrix with his medical history which included cigarette smoking and "some type of blood clot either in his leg, lung or both." The history also indicated that Mr. Wyatt stated that he was not taking any anticoagulants (blood thinners) and that he had not been told that he needed to do so. Mr. Wyatt also reported that his shortness of breath did not interfere with his daily activities. A physical examination revealed rales in the base of Mr. Wyatt's left lung. Based on the x-ray and physical examination, Dr. Hendrix concluded that Mr. Wyatt had pneumonia and began treatment with antibiotics. He also continued the Lovenox and ordered a lung scan to determine whether Mr. Wyatt had suffered an acute pulmonary embolism (blood clot in the lungs). The lung scan revealed a "high probability for pulmonary embolus."
On August 29, 2001, Dr. Hendrix examined Mr. Wyatt, who appeared to have improved. He was no longer experiencing shortness of breath and his oxygen saturation had improved. In a progress note dated that day, Dr. Hendrix wrote:
Lung scan was positive for pulmonary embolus. At least Dr. Pumilia read as high probability. I am going to start the patient on Coumadin and also IV antibiotics.
Dr. Hendrix discontinued the Lovenox and placed Mr. Wyatt on Coumadin 5mg to be taken by mouth.
On August 30, 2001, Dr. Hendrix documented the following in the progress notes:
Still having some pain in his right chest, but his lungs sound a lot better. He is able to do without oxygen for now. I think given his continued complaints and the fact [that] he had pneumonia on the right side and also the fact that he had a pulmonary embolus and also the fact that he smokes, I think a CT of the chest is indicated to be sure the patient does not have a pulmonary tumor or associated neoplastic process going on....
Dr. Hendrix ordered a CT of the chest, which showed inflammation in the lower lobes of both lungs. The radiologist opined that the areas "probably represent pneumonitis with some post inflammatory scarring" and noted that "neoplasm cannot unequivocally be ruled out."
On August 31, 2001, Dr. Hendrix noted that Mr. Wyatt was short of breath when he attempted to perform an act too quickly. He also noted that Mr. Wyatt was able to walk around the hospital and that his INR, a blood test used to evaluate the effectiveness of the blood thinner, was 1.45. Dr. Hendrix discharged Mr. Wyatt from the hospital and provided him with *239 samples of an antibiotic and a prescription for Coumadin. Mr. Wyatt was instructed to continue his course of antibiotics and blood thinner, to stop smoking, to refrain from being in the same room with anyone smoking and to return to see Dr. Hendrix in one week for an INR. On the discharge summary dictated by Dr. Hendrix, Mr. Wyatt's discharge diagnosis was noted as "Pulmonary embolus, pneumonia."
On September 4, 2001, plaintiff drove Mr. Wyatt to the home of his cousin, Vernon Mangum. According to Mangum, Mr. Wyatt began to experience respiratory difficulties "a couple of minutes" after he arrived and he had difficulty speaking. Mangum testified that he helped Mr. Wyatt to his van and drove him to the emergency room. Emergency room records reveal that Mr. Wyatt arrived at the hospital at 1:09 p.m. and was "lethargic" and "cyanotic, diaphoretic." The records also indicate that Mr. Wyatt was "gasping," his heart rate was low and his blood pressure was unobtainable. Resuscitation attempts were unsuccessful and he was pronounced dead at 1:50 p.m.
Plaintiff presented her claims to a medical review panel. The medical review panel concluded that Dr. Hendrix breached the applicable medical standards of care in his treatment of Mr. Wyatt and the breach caused Mr. Wyatt's death. In its opinion, the panel stated:
The panel is of the opinion that the dose of Lovenox 30 mg was below the recommended dosing regimen for a man of the weight of Mr. Wyatt. The dosage should have been approximately 80mg every 12 hours from the time the pulmonary embolism was diagnosed on August 29, 2001, and the Lovenox should have been continued until the INR reached a reading of 2.0. The Lovenox also should have been continued longer to overlap with the beginning of Coumadin 5mg. Even though the INR had increased from 1.31 on August 30 to 1.45 on August 31, the date of discharge, it had not reached the effective therapeutic range. Unfortunately, the panel is of the opinion that the Lovenox was stopped at least one day too soon.
On December 20, 2005, plaintiff filed the instant medical malpractice action. Following a jury trial, the jury found that plaintiff failed to prove, by a preponderance of the evidence, "the degree of knowledge or skill possessed or the degree of care ordinarily exercised by an internal medicine physician at the time of Dr. Ricky Hendrix's care and treatment of William Wyatt." Plaintiff's claims were dismissed in accordance with the jury's verdict. This appeal ensued.

DISCUSSION

Jury Selection
Plaintiff contends the trial court erred in denying her challenges for cause with regard to certain prospective jurors. Plaintiff argues that three jurors, Charles J. Griffin, William Gates and Sandra Parker, who were ultimately excused on peremptory challenges, should have been excused for cause due to bias.
LSA-C.C.P. art. 1765 provides, in pertinent part:
A juror may be challenged for cause based upon any of the following:
* * *
(2) When the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial;
(3) When the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party or his attorney are such that it must be reasonably believed that they *240 would influence the juror in coming to a verdict;
* * *
A trial judge is vested with broad discretion in ruling on challenges for cause and will be reversed only when review of voir dire as a whole indicates an abuse of that discretion. Riddle v. Bickford, 2000-2408 (La.5/15/01), 785 So.2d 795; Simms v. Progressive Ins. Co., 38,804 (La.App.2d Cir.9/25/04), 883 So.2d 473, writ denied, 2004-2871 (La.1/28/05), 893 So.2d 78. Criminal jurisprudence on challenges for cause may be considered in civil cases. Simms, supra; Bannerman v. Bishop, 28,382 (La.App.2d Cir.7/12/96), 688 So.2d 570, writ denied, 96-2755 (La.1/10/97), 685 So.2d 146.
In State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, the Louisiana Supreme Court stated:
A refusal by a trial judge to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably inferred."
Id. 1281, quoting State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990) (other internal citations omitted). The standard used in determining whether a prospective juror may be removed for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, cert. denied, Roy v. Louisiana, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997).

Charles J. Griffin
During voir dire, the trial court questioned prospective juror, Charles J. Griffin, as follows:
Q: [A]re you acquainted with any of the parties to this lawsuit that you know of?
A: Only Doctor Hendrix.
* * *
Q: And how do you know Doctor Hendrix?
A: He's my family doctor, and his stepfather is my first cousin.
* * *
The following exchange occurred between plaintiff's counsel and Griffin:
Q: Doctor Hendrix is your doctor?
A: Yes, sir.
Q: Do you see him regularly?
A: Yes, sir.
Q: And how long have you been seeing him, sir?
A: 10 years.... That'd be a guess, it could be 8 or 10.
Q: [H]ow [are you] related to Doctor Hendrix?
A: Well, [my] wife is his stepmother's first cousin.
* * *
Q: Do you socialize with him?
A: Maybe once a year.
* * *
Q: No other contact?

*241 A: Just for doctoring purposes.
Q: Okay. Do you have knowledge of this case?
A: None, whatsoever.
* * *
Q: Now, Doctor Hendrix is your doctor, correct?
A: Correct.
* * *
Q: Do you feel that there are others in this court room who would be a better judge of whether he did something inappropriate than you?
A: I'm sure there is.
* * *
Q: Because you trust him, correct?
A: Yes, I do.
Q: And you like him, correct?
A: Yes, I do.
Q: And it would be very difficult for you to render a money judgment against him and his insurance company, would it not?
A: I don't have any problem with that. I don't have any problem with that.... [a]fter the facts are made clear.
Q: Okay. So let's say this, let's say that you're sitting on this jury and evidence is introduced to you that other doctors feel that he did something inappropriate. Are you saying that even though he's your doctor you can find against him?
A: If I was sitting on that jury, it would be my responsibility to do that . . . [t]o listen to all of their facts.
* * *
Q: [I]s this something you would rather not do?
A: I'd rather not do it.
* * *
Q: If we prove our case and if the evidence shows that a substantial award should be made against your doctor, is that something that you can do or is that something that you would have a great problem with?
A: That's something I could do.
* * *
Q: Okay. If you do that in this case, hypothetically if that was done by you in this case, would you continue to use Doctor Hendrix as your doctor?
A: Yes, I would.
Q: That wouldn't matter?
A: It wouldn't matter.
* * *
Q: Do you agree that a doctor, a medical doctor should be held to certain standards when he treats people?
A: Yes, I do.
Q: And when he fails to meet those standards in his treatment of that person, do you agree that he should be responsible?
A: Yes, I do.
Q: Even though he's your doctor?
A: Even though he's my doctor.
* * *
Defense counsel questioned Griffin as follows:
Q: If you were asked to consider a medical record from Winn Parish that went backdated August 27, *242 2001 or August 31, 2002 as far as the evidence that will be introduced in this trial, is that something that you think you'll be able to do?
A: Yes.
* * *
Q: In medical care generally, do you have any problems with the concept that a doctor can try his best and there still could be a bad result, the patient may die. Do you have any problem with that concept?
A: I don't have any problem.
* * *
Q: If there is evidence in this case that's documented in the medical chart about what was done, what decisions were made, can you consider that as well as the testimony of any doctor that testifies in coming up here?
A: Yes, I can. Yes, sir.
* * *
Q: If a judge does indeed instruct you that the plaintiff does have a burden, that the plaintiff can't recover one penny unless a serious burden of proving to your satisfaction that they're entitled to money, is that something that you could hold them to?
A: Yeah, I can.
Q: If at the end of this case, after you've heard all of it, if you truly believe that the plaintiff, Hazel Wyatt, [was] entitled to zero, not one penny, could you come back in here, and she's sitting here, make as your decision?
A: [E]xactly.
* * *
Plaintiff raised a challenge for cause, contending "Mr. Charles Griffin knows Doctor Hendrix." Plaintiff argued that Dr. Hendrix was Griffin's physician and Griffin's wife was related to Dr. Hendrix. The trial court denied plaintiff's challenge for cause.
After a review of the entire voir dire transcript, we find no abuse of discretion in the trial court's ruling. Although it appears that Griffin was related to Dr. Hendrix, according to Griffin's statements, they rarely socialized together.[2] Moreover, Griffin made it clear that his association with Dr. Hendrix would not affect his service on the jury. He stated that he would have no problem rendering a verdict against Dr. Hendrix and that Dr. Hendrix would remain his family physician regardless of the verdict. Griffin also stated that any physician who failed to meet the standard of care should be held responsible. He further stated that he could follow the trial court's instructions. Thus, we find that Griffin's responses as a whole demonstrated his ability to serve on the jury without bias or prejudice.[3]

William F. Gates
During voir dire, in response to the trial court's questions, a prospective juror, William F. Gates, stated that he knew Dr. Hendrix because "Doctor Hendrix has helped my familymy dad in a couple of situations when we had to go to the ER *243 toto get him to a facility that they could do heart surgery with him. He has helped to get transportation and things set up." Thereafter, the following colloquy took place between plaintiff's counsel and Gates:
Q: [H]as Doctor Hendrix treated you personally?
A: No. No, he has not.
Q: He's treated your family members?
A: Yes, he has.
Q: How many of them?
A: My dad.
* * *
Q: Do you have any other interactions with Doctor Hendrix?
A: He's a member of the Gideon's, and I ... contribute to that and kind of mingle with the Gideon's with him.
Q: Okay. Are you a Gideon?
A: No, I'm not. I just donate.
* * *
Q: [Y]ou see him in that aspect ... you see him at Gideon functions, maybe?
A: No, I do not. I haven't been to the functions, I just donate.
Q: Okay. I'mI'm wondering how you see him, or do you?
A: I know he heads up the Gideon's here in Winn Parish, and, you know, I've got respect for that man for that.
Q: [I]s sitting on this jury something you would want to do?
A: Not really.
Q: And I'm assuming the reason for that is because you do have a certain level of respect for Doctor Hendrix, is that correct?
A: Yes, I do.
Q: And I'm assuming also that in countin terms of Hazel Wyatt versus Doctor Hendrix, Doctor Hendrix is higher on the list, correct.
A: Truthfully, yes.
* * *
Q: [I]n terms of people who have no connection with Doctor Hendrix, there would probably be other people in this room who would fit that bill, correct?
A: Probably would.
Q: Okay. And this feeling that you have for him, I understand that and I understand where you're coming from. And my point is that, that feeling puts him ahead of Ms. Wyatt in your mind in terms of a lot of areas, correct.
A: Correct.
Q: And credibility is one of them, right?
A: Yes, sir.
Q: Because you believe what he says, correct?
A: Yes.
Q: Okay. And that'sin other words, thatthat feeling in your mind is has been there, by virtue of the way you've interacted with him and the way he's treated your dad.
A: Right.
Q: And the trust that you have for him, and the fact that he heads an organization, right.
A: Right.
Q: And that is something that no matter what, you're still going to have that feeling, right?
A: True.
The following exchange occurred between Gates and defense counsel:

*244 * * *
Q: If you were selected to serve on the jury and your duty as a juror was to listen to all of the evidence and render a fair decision, just from your make up and who you are, is that something you could do?
A: Yes, sir, I believe I could.
Q: You don't see Doctor Hendrix every day, do you?
A: No, sir.
Q: The opinions you have concerning the actual medicine in this case would be zero at this point, correct? You don't know anything about the medicine, one way or the other?
A: I don't know nothing about it.
Q: That actual treatment decisions that the plaintiff has called into question concerning Mr. William Wyatt, the first you heard about any of that would be when you came to the court house yesterday?
A: That's the first time I heard anything about it.
Q: [I]f you were asked to serve on a jury, and you took an oath that you were going to be fair and impartial to both sides, and hear all the evidence. Could you put that into respect [sic] and actually do that?
A: Yes, sir, I could.
* * *
Q: [T]he fact that you're going to hear from the plaintiffs first does that cause you to, you know, go with your first impression or can you wait to hear all of the evidence?
A: I could hear it all.
* * *
After a number of other jurors were questioned, voir dire of Gates resumed. The following colloquy took place between plaintiff's counsel and Gates:
Q: [I]t's important for us for people to be on this jury who've not made their mind up.... What we're trying to say is that we would rather you not be here if you have thoughts, do you understand what I'm saying?
A: Yes.
Q: [Y]ou had told me that no matter what you felt like that he had a great deal of credibility.
A: He does. With me he does.
Q: Okay. And isn't it true that that's going to shade your judgment in this case?
A: Truthfully, it could.
* * *
Q: You contribute to the Gideons, correct?
A: Yes. I do.
Q: Doctor Hendrix is involved in the Gideons?
A: Yes, he is.
Q: You respect the Gideons' work.
A: I sure do.
Q: [Y]ou need to tell us if, here today, your opinion of Doctor Hendrix is such that you cannot sit on this jury and be fair and impartial....
A: I highly respect the man. And I'm not saying that I wouldn't be impartial, I probably would. I have nothing but respect for the man. He's always treated me and my family perfect.
* * *
Q: And you would find it hard, would you not, to believe that he made a medical error?

*245 A: If I seen [sic] the facts, I would have to go with the facts.
Q: Even though ... you describe feelings that you have for him which are very strong?
A: If I'm under oath, I have to do what's right.
Q: Do you trust Doctor Hendrix?
A: I sure do.
Q: Do you trust Ms. Wyatt?
A: I don't know Ms. Wyatt, but yes, I'd have to trust her.
* * *
Thereafter, plaintiff challenged Gates for cause based upon the fact that Dr. Hendrix had treated Gates' father. Plaintiff counsel also pointed out that Gates had expressed feelings of respect for Dr. Hendrix and had stated that he trusted Dr. Hendrix.
We find no abuse of discretion in the trial court's denial of the challenge for cause with regard to Gates. Although Gates admitted that he respected and trusted Dr. Hendrix, he also stated that he would listen to all of the evidence and would make a fair decision. He further stated that his decision would be based on the evidence, not on his feelings and his family's relationship with Dr. Hendrix. Thus, we find that Gates' responses, as a whole, did not indicate bias, prejudice or the inability to render a fair and impartial verdict.

Sandra Austin Parker
In response to the trial court's questions, Parker indicated that she knew Dr. Hendrix, stating, "We go to church together." The following exchange took place between Parker and plaintiff's counsel:
Q: You say you go to church with Doctor Hendrix?
A: Right.
Q: And how long have you gone to the same church that he goes to?
A: Oh, we've probably been going there about 20 years.
Q: Okay. How long have you known Doctor Hendrix?
A: Several years, I don't know how long.
Q: Do you also know his wife?
A: Yes.
Q: Are you friends with his wife?
A: Uh-huh.
Q: Yes?
A: Yes.
Q: How often do you see his wife?
A: Not very often.
Q: How do you see her, would it be at an event or you are in a club together?
A: No, it would just be an event or around town.
Q: In passing?
A: Yeah.
Q: Do you hold a position at the church that y'all attend?
A: No.
Q: I believe he does, doesn't he? Doctor Hendrix?
A: Not that I know of, I don't know.
Q: Okay. Does Mrs. Hendrix hold a position?
A: She does.
Q: What is that, if you know?
A: I don't know what it's called.
Q: Okay. Do you have any knowledge about this case, ma'am?
A: No.
* * *
Q: If the evidence of this case shows that a substantial money judgment should be rendered against Doctor *246 Hendrix, would that give you a reason to pause and would that give you a problem?
A: No.
Q: Is that something that you're telling us you could do?
A: Uh-huh.
Q: Even though you're friends with him?
A: Yes.
Q: Even though you're friends with his wife?
A: Yes.
Q: Even though you go to the same church?
A: Yes.
* * *
Q: Would you agree that pain and suffering is a legitimate aspect of damages?
A: Not necessarily. I mean, money is not going to help your pain and suffering.
Q: Would that be something that you would be inclined not to make an award for?
A: No, I'd have to listen to everything first.
Q: Well, is it something that you would make an award for? Or, as you just said, it's something that money can't replace?
A: I'd justI'd have to hear the evidence, see why it's being filed.
Q: In this case, would you be able to award money damages to Ms. Wyatt if it's proven that medical negligence occurred?
A: Yes.
* * *
Q: If aif a three doctor panel, if their opinion is introduced in this case and it says the standard wasn't met, would that matter to you?
A: Saying that he didn't give the patient the medical treatment that he should have had?
Q: Saying that he did not meet the appropriate medical standard when he treated the patient, would that matter to you?
A: Yes, it would matter.
Q: Would you consider it as evidence?
A: Yes.
Q: Would you be inclined to disregard it by virtue of your friendship?
A: No.
Q: Would you be inclined to give it any weight whatsoever, or would you ignore it?
A: Would I ignore what?
Q: The Panel opinion.
A: No, I wouldn't ignore it.
* * *
Parker was then questioned by defense counsel as follows:
* * *
Q: If the judge instructs you as a manner of law that the plaintiff does have the burden in a case such as this, Ms. Wyatt does have to prove her case to the preponderance of the evidence that you've heard about, do you have any problems with that?
A: No.
Q: How do you handle emotion?
A: I'm probably pretty emotional.
Q: In this case, if Mrs. Wyatt gets emotional ... on the witness stand and you're asked to sit on this jury, is that emotion going to affect you to the extent you don't feel you could listen to the rest of the evidence *247 and decide the case on all the evidence?
A: Well, I mean, I might get emotional if she did, but I don't think it would affect me judging the case.
* * *
Plaintiff challenged Parker for cause based on her statements that she attended church with Dr. Hendrix and that she was friends with Dr. Hendrix's wife. The trial court denied the challenge for cause.
We find no abuse of discretion in the trial court's ruling. Parker stated that she would be able to render a money judgment against Dr. Hendrix if the evidence supported it. Her statements indicated that she had limited contact with Dr. and Mrs. Hendrix and that she only saw them "in passing." Parker was unequivocal in her statements that she would consider all of the evidence and would not be affected by any relationship with Dr. Hendrix or his wife.

Jamey Joe Maxwell
Jamey Maxwell was also called for voir dire examination. Both plaintiff and defense raised challenges for cause, which the trial court denied. Both parties had exhausted all of their peremptory strikes, so Maxwell was seated on the jury.
A party who has exhausted all of his peremptory challenges before completion of the panel is entitled to appeal a ruling refusing to maintain a challenge for cause. The party must show: (1) the trial judge erred in refusing to maintain his challenge for cause; and (2) he exhausted all of his peremptory challenges. State v. Sylvester, 400 So.2d 640 (La.1981). He need not show injury resulting from the court's action by forcing him to accept the challenged juror. Id.
During questions posed by the trial court, Maxwell stated that he was a deputy sheriff and that he knew Dr. Hendrix "through my work at the sheriff's office of bringing people in and out of the emergency room during wrecks and accidents." The following colloquy occurred between Maxwell and plaintiff's counsel:
* * *
Q: Let me ask you about your interaction with Doctor Hendrix. Is he your friend?
A: We don't socialize on a day-to-day basis. When we go inwhen I go in the emergency room, we speak, we're very cordial to one another. You know I think he does a good job at the emergency room, and I think he's a lot like us, he has to do things on the spur of the moment that he has to make a decision right then and he does whatI think he does a good job at that.
Q: Have you now formed an opinion, and you have an opinion that he does a good job no matter what?
A: No, not no matter what. In the circumstances I've seen him, he has done a good job.
Q: Okay. Would you call him your friend?
A: I'm not going to have supper with him this evening, but, yeah, I'veif we saw him in town or if I saw him at the Wal-Mart, we'd stop and speak.
* * *
Q: Okay. Now, as we sit here today, do you already have an opinion about Doctor Hendrix's medical care?
A: No, sir, notnot in this case I do not.
Q: Okay. Do you have any knowledge about this case?
A: No, I do not.

*248 * * *
Q: In this case, if the facts and the evidence show that an award of money damages should be made to Ms. Wyatt, for the death of her husband and for the pain and suffering that he underwent before his death, is that something you could do?
A: Yes, sir.
Q: Even if it's against Doctor Hendrix?
A: No matter who it's against.
* * *
Q: Do you agree that a doctor should be held to a certain medical standard in treating his patients?
A: Yes, sir.
Q: If a doctor harms his patient by his failure to do something and that failure causes harm, should the doctor be responsible?
A: II would have to say that would be limited to a certainI'd have to know the whole circumstances. It would be like me going out and making a decision and then six months later somebody saying you should have done this. II don't knowit would have to be the circumstances. He has to make a decision, at that point he makes that decision what he thought best. I don'tI can't see where it would be bestin the best interest to say he shouldn't do that anymore when he did the best he thought he could do, at that time he was doing the best he thought he could do.
* * *
Q: Is it your belief that if a doctor does the best he can do, that's okay?
A: My opinion is, in a certain circumstance where he has to make that decision instantly, whether it's to give them the right medicine to save their life or not and that's reverse reaction, I don't see where if he's doing the best he can do at that point and making that split decision when he takes that; no, I do not.... That's the same way that that's the same thing I live by day-to-day. We have to bewe're expected to do a job to a certain standard. And whether you think it's right or whether the judge thinks it's right, it's ... in our heart whether we did the right thing or not. And that's what I have to live with.
Q: [I]f you're chosen, you would hold Doctor Hendrix to, is it the standard that I did the best I could under the circumstances?
A: I don't understand where me not being a doctor I have that right to decide if he did the right thing or not.
Q: Well, wouldn't that impact on your ability to sit on a jury?
A: I think youin most civil cases I've seen and been around, undoubtably you have a medical board that's overseen what he's done. Yes, sir, right or wrong.
Q: In this case, there is a Medical Review Panel opinion.... But if your opinion is that Doctor Hendrixif your opinion in this case is that he did all he could, or he did his best, I need to know that.
A: I don'tI don't know if he did his best, because I don't know what happened. But on the daily basis where I see him in the emergency room, I believe he's doing the best he can, and that'sand that so far has been good, as far as I know.

*249 Q: [I]f it's testified in this case, by him, that he did the very best he could, is that good enough for you?
A: It would have to be.
Q: Okay. And if the Judge tells you that the medical standard of care is higher than that, that's something that you would have a hard time following, isn't it?
A: I would have a hard time ofof any person saying he's ... [done] the best that he could do saying that wasn't good enough.
* * *
Q: Okay. And so in this case, if you're instructed by the court that the medical standard of care he needed to follow is greater than I did the best I could. You would have trouble following that, would you not?
A: I don't know if I would have a problem following it. It would ... weigh on my mind to try to ... see what he went through when he was doing it. When he got there.... I don't know how to answer your question I guess.
* * *
On a day-to-day basis, we have to listen to both sides of the story if we go on a call, decide which one goes to jail or if anybody goes to jail or both go to jail. I understand that some decision has to be made. We have to make that decision also. I'm going to listen to both sides. And I'm going to decide at that point who was right and who was wrong, in my opinion.
Q: [Y]ou've sat here for two days and you've heard comments from the defense that Doctor Hendrix did the best he could do, have you not?
A: I have.
* * *
Q: Okay. And you believe that he did even though you don't know about the facts of the case you've heard thatthose comments and you believe he did the best he could do, don't you?
A: I believe he does, yes.
Q: And that's my point. Isn't that the standard you're going to hold him to?
A: II'm going to have to.
* * *
The exchange between Maxwell and defense counsel was as follows:
Q: [I]f you're asked to serve on this jury at the end of thisat the conclusion [of] evidence, when you know what the case is about factually, if the Judge instructs you as to the law of the case, the law that's to be applied, would you do your best to follow the Judge's instructions?
A: Yes, sir, I would.
Q: I assume on a daily basis that's your job to uphold the law as you understand it?
A: Yes, sir.
* * *
Plaintiff contends the trial court erred in denying the challenge for cause. Plaintiff's challenge was based on Maxwell's statements that he believed that Dr. Hendrix did a good job. Plaintiff also questioned Maxwell's seeming confusion with accepting the applicable standard of care. After reviewing the transcript of Maxwell's voir dire examination, we find that his responses, as a whole, did not indicate that he was biased, prejudiced or unable to render a verdict according to law. Although *250 Maxwell stated that he believed that Dr. Hendrix did a good job on the occasions that he had observed him, he stated that he did not know the facts of this case and that he had not formed any opinion with regard to Dr. Hendrix's care in this case. Maxwell also stated that anyone who did something wrong should be held accountable for his actions, that he would not have a problem awarding a money judgment against Dr. Hendrix and that he would follow the law as provided in the judge's instructions. Therefore, we cannot conclude that the trial court erred in denying plaintiff's challenge for cause.

Elizabeth Jones Chelette
Plaintiff also contends the trial court erred in granting a defense challenge for cause with regard to prospective juror, Elizabeth Jones Chelette. Plaintiff argues that the defense failed to articulate sufficient reasons in support of the challenge for cause as required by LSA-C.C.P. art. 1765.
During voir dire, in response to questions posed by the trial court, Chelette indicated that her sister had been involved in "litigation involving a hospital or doctor." Thereafter, the following exchange occurred between plaintiff's counsel and Chelette:
* * *
Q: You said your sister and her family were involved in a medical lawsuit?
A: Yes.
Q: [C]an you give me an idea of what's going on there?
A: It was at the VA.
Q: Okay. And someone was harmed due to medical treatment?
A: Yes.
Q: Was there a trial, or do you know?
A: It was out of court.
* * *
Q: In this case, if we prove our case, if the evidence shows that we win, okay, and if the evidence also shows that a substantial award should be made to Ms. Wyatt, is that something you could do?
A: Yes, sir.
* * *
Defense counsel questioned Chelette as follows:
Q: The matter that involved your sister, how long ago are we talking about?
A: Oh, seven or eight years.
Q: And tell me a little bit more about it. Was it her husband that was treated?
A: It was her husband, uh-huh.
Q: Did you have to participate in any fashion?
A: No, no.
* * *
Q: [I]f you're asked to serve on this jury is there any problem in your own way of receiving information? You will wait to hear all of the disputes, all of the evidence and the Judge's instruction on the law to apply to that before you make up your mind?
A: I'd like to hear all of the evidence.
Q: Is that the way you would go about making your decisions
A: Yes.
Q: generally?
A: Yes.
Q: What about emotion, is emotion something that, if it's present, and I don't know that it will be, but if it is present in this particular case, is *251 that something that's going to be a problem for me, if Ms. Wyatt is very upset?
A: II don't think it would. I'd feel for her. I feel for her but I don't think it would make any difference.
Q: As far as the medical, and I know that your sister's husband has filed a suit with the VA. Did that involve hospital care or doctor care?
A: Doctor.
* * *
Q: Have you lost anyone personally, family or a personal friend in the last five years?
A: I lost a nephew four weeks ago.
Q: And was that a natural death or something else?
A: Natural.
Q: So were you involvedwere you very close to the nephew?
A: I was.
Q: The fact that this case is concerned with those factors in 2001, it concerns Ms. Wyatt suing for a loss of her husband, is that going to be a problem since you have recently experienced a loss?
A: I don't know. II get emotional sometimes, so.
* * *
Q: [I]f you're asked to serve on this jury, in light of the fact that you have a loss in your family four weeks ago, is that something you think you'd have trouble being fair to me about? Because I represent the defendant.
A: I don't think so. I don't think so.
Q: You said, just a minute ago about being emotional, do you think that arisingemotion arising out of the fact that you just lost somebody, do you think that that's something that you will have a problem with though, or do you think you could adhere to it?
A: I'm not for sure about that. I really don't know.
* * *
After several other jurors were questioned, voir dire of Chelette resumed. Plaintiff's counsel questioned Chelette as follows:
Q: [I]f you serve as a juror in this case, the Judge will give you instructions, and he'll tell you the law and he'll tell you what to do and tell you how to apply and tell you to find the facts and tell you to do certain things. And what we need to know isis can youcan you do that and can you be fair to both sides ...?
A: I think I would have some problems, I do.
Q: Okay. Thank you.
[Trial court]: What was your response?
A: I think I would have some problems.
The defense challenged Chelette for cause, arguing that Chelette had indicated that she did not believe that she could be fair. The trial court granted the challenge for cause, stating:
The lady appeared to be very weak in regards to the family member's death and just didn't have the fortitude to serve as a juror and to apply the law. She would have been influenced greatly by the previous involvement in litigation.
We find no error in the trial court's decision to grant the challenge for cause with regard to Chelette. Chelette admitted that she was uncertain as to whether she could make a fair decision. When asked whether she could be fair, in light of *252 her nephew's recent death, Chelette responded, "I don't think so. I don't think so." After considering Chelette's responses, and reviewing the voir dire as a whole, we do not find that the trial court abused its discretion in dismissing Chelette for cause.

Ella Cotellian Anderson
Plaintiff also contends the trial court erred in granting a defense challenge for cause as to prospective juror Ella Anderson. During voir dire, plaintiff's counsel questioned Anderson as follows:
* * *
Q: Do you agree that doctors should be held to a certain standard when they treat their patients?
A: Yes, I do.
Q: Do you ... also agree that doctors should know the correct dosage of medicine to give people for certain problems?
A: Yes, I do.
* * *
Q: [I]f ... you serve on this jury, would you agree to be fair to both of them, both Hazel and Doctor Hendrix?
A: Yes.
Q: In other words, you would agree to listen to the evidence?
A: Yes.
Q: And you would agree to listen to the rules that the Judge gives you?
A: Yes.
Q: And you have no problem serving on this jury?
A: Yes, I do have a problem.
Q: What's that?
A: Because I already care for them myself because I [have] had some bad situations myself. I've been mis-diagnosed before because I have a lot of health problems.
* * *
Q: Can you move that out of the way and serve on this case ...?
A: Yes.
Q: Okay. Because what we want is we want each ... person, Hazel and Doctor Hendrix to start off at the same starting line. Where they finish up, who know. But we want them to start at the same place. Can you do that?
A: Yes.
* * *
Q: Will you agree to listen to all of the evidence, meaning the evidence we put on and the evidence they put on?
A: Possibly, yeah.
Q: Okay. We need to know.
A: Well, I already have had some bad feelings so I mean, that's why I would prefer not to be chosen.
Q: [Y]ou don't want to be chosen because you've got bad feelings?
A: Yes.
Q: You don't have bad feelings against Doctor Hendrix, do you?
A: No. But I know that they do make mistakes.
Q: Okay. And you feel they made a mistake on you?
A: I feel like they didn't do enough. They didn't do everything they should have before they gave me what they gave me.
Q: [C]an you put that out of your mind, that's the big question that we have to answer. Can you put that out of your mind to serve on this jury?
A: Honestly, no.

*253 Q: Now, you're sure?
A: Yes.
Q: [I] just want to know the truth and I want to know that, in other words... if you feel like you can serve and be fair, or you can't. And we'll... let you make that choice.
A: I can. I can.
Q: [I]f you are chosen, will you agree to be fair to both sides?
A: Yes, I will.
* * *
Thereafter, defense counsel questioned Anderson as follows:
* * *
Q: [Y]ou do have some bad feelings. You're not saying about Doctor Hendrix because I don't think he's treated you, has he?
A: No.
Q: But you've had health care personal to you there has been some problem is what you're telling us?
A: Yes.
* * *
Q: [T]he first time you said that because of some mis-diagnosis ... you believe that you were mis-diagnosed?
A: I know I was.
Q: Okay. Based on that experience that you have had, it would be difficult for you to come and be a juror on this case because you've had a previous experience?
A: Yes.
* * *
Q: As you sit right now, you've already kind of got an opinion going, would that be fair?
A: No, I don't have an opinion ... I haven't heard enough about the case to really have an opinion about it. But I just know how I feel as a person.
* * *
Q: You already have an opinion because of your personal experience?
A: No.
Q: About doctors and diagnosing and treating?
A: Yes.
Q: [A]s you sit there now, you have an opinion that when you were being treated, a doctor or doctors didn't do it correctly or mis-diagnosed ...?
A: Yes.
Q: Okay. That's something that would be hard for you if you were asked to sit on this jury and you've got that experience, right?
A: Yes, I have the experience. But honestly, no, it just really wouldn't be a problem. I just don't want to pass judgment on nobody [sic]. That's honestly, I don't want to pass the judgment.
Q: [W]hat you're telling me is that you don't think you ought to be picked to serve on this jury.
A: Yes.
Q: [H]ow long ago were you talking about that you would have had dealings with doctors for your own personal health care?
A: I have dealings with them all the time.
* * *
Q: [H]as there been in the past experience that you've had with health care generally, doctors, hospital and nurses, that has caused you to be *254 unhappy with them as you sit. Your answer to that would be yes?
A: Yes.
* * *
After other jurors were questioned, voir dire of Anderson continued. The following exchange took place between plaintiff's counsel and Anderson:
Q: [I]f you're chosen as a juror in this case, which means that you have to make a decision, can you do that and do it in a fair manner?
A: Honestly, yes, I can. I just don't want to. But, yes, I can.
Defense counsel questioned Anderson as follows:
Q: [I]'m not trying to pry into your health care at all ... mis-diagnosis is a word I've written down. Is that something that happened in your health care?
A: Yes.
Q: And is that something that's only happened on one occasion or have you had some repeated bad encounters about your health care?
A: I've had repeated bad encounters.
Q: Are they mis-diagnosing you each time or is it different stuff?
A: It has been different things that I've been mis-diagnosed on and medicated for. But as I have said, I have no problem with Dr. Hendrix. Yes, I can make a decision, fair and honestly with the evidence.
Q: [W]hen, most recent to today, have you had an encounter with either your doctor or some type of health care provider that was not good thatin your opinion, was not good?
A: What do you mean by recently?
Q: Well, in other words, are we talking about yesterday, was it ten years ago? I'm trying to get an idea of the time period.
* * *
A: About seven months ago.
Q: Were you unhappy enough to where you did go speak to an attorney about it?
A: No, I didn't.
Q: Did you make a complaint either to the doctor or to the hospital about it?
A: I tell them. When I got a problem, I tell it to the people that I'm dealing with. So I got a referral and got another doctor.
Q: [I]n the problem with the previous doctor, did that cause you some health problems or some physical problems?
A: Yeah.
Q: [D]oes that ... continue to today that you're still having to deal with it?
A: Mentally, yes. I was told I had cancer and I didn't, so there was a mental tear down.
Q: [K]nowing that experience that you had and knowing that was a case about a medicaltreatment of a medical condition, how are you able to put your personal experience away so that it wouldn't spill over into this case?
A: Because Doctor Hendrix didn't do anything to hurt me. And I do know that in life things do happen. And maybe it's not his fault, but I'm not at liberty right now to say it. I don't know that, I have to look at what's put before me and judge by that. Not by how I feel, because it's not about me.

*255 * * *
Q: [T]he last time you were up there you said that honestly you didn't want to be the judge. You didn't want to judge.
A: I did notI just don't want to.
* * *
Q: [T]he last time you were up, you said you did not want to judge someone ... you've now said that you don't mind doing it.... [W]hat changed between the last time you were sitting there and now?
A: Basically, the first time I said it, I don't want to do it, but yes, I could. When you asked me that I said honestly, yes, I could. But I don't want to. There's a difference.
Q: And that's still your position?
A: Yeah, I just don't want to. This is my first time.... And I'm a little nervous about that. And I don't like passing judgment on nobody.
The defense challenged Anderson for cause, arguing that Anderson initially stated that she had formed an opinion in this case. The defense also pointed out Anderson's statements with regard to her previous negative experiences with health care professionals. The defense maintained that Anderson still had time to consult an attorney for any potential claims, since the alleged incident took place only seven months prior to the trial in this matter. The trial court granted the challenge stating:
[Anderson's] testimony indicated such uncertainty that during the first part of her testimony she didn't feel like she could judge anybody. And she didn't feel like she could be on this case, and didn't want to be on it and was very reluctant. And expressed her concern deeply concerning her prior activities with a doctor. And I think that her former treatments and things that would greatly influence her in arriving at a judgment also. I think the bias that she has as far as medical isis evident and very material and should beshe should be excluded....
We find that the trial court did not abuse its discretion when it granted defense counsel's challenge for cause with regard to Anderson. Anderson stated that she "already care for [plaintiff] myself because I [have] had some bad situations myself." When asked whether she would listen to all of the evidence, she initially replied, "Possibly, yeah." She also stated that she did not want to serve on the jury because she "ha[s] had some bad feelings" and again referred to her fairly recent negative experiences with medical professionals. Anderson further expressed her reluctance "to judge anybody." Considering Anderson's responses, we find that the trial court did not abuse its discretion, since Anderson did not demonstrate "a willingness and ability to decide the case impartially ...." as set forth in State v. Robertson, supra.

Chrissy Evonne Chatman
The defense exercised a peremptory challenge to strike Chrissy Evonne Chatman, an African-American juror. Plaintiff objected to the challenge, citing Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
An equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. Batson, surpa; State v. Jones, 42,531 (La.App.2d Cir.11/7/07), 968 So.2d 1247. A private litigant in a civil case may not use peremptory challenges to exclude jurors on account of their race. Edmonson v. Leesville Concrete Company, Inc., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 *256 (1991). In Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), the three-step Batson process was described as follows:
First, the trial court must determine whether the [challenging party] has made a prima facie showing that the [opposing party] exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the [opposing party] to present a race-neutral explanation for striking the juror in question. Although the [opposing party] must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the [challenging party] has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the [opposing party], but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.
546 U.S. at 338, 126 S.Ct. 969 (internal quotations and citations omitted). See also Hurts v. Woodis, 95-2166 (La.App. 1st Cir.6/28/96), 676 So.2d 1166.
A reviewing court owes the district court's evaluations of discriminatory intent great deference and should not reverse those evaluations unless they are clearly erroneous. Batson, supra; State v. Elie, XXXX-XXXX (La.7/10/06), 936 So.2d 791; State v. Jones, supra. The district court is in a position to observe firsthand the demeanor of the attorneys and the venire members, the nuances of the questions asked, the racial composition of the venire and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, cert denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006); State v. Jones, supra.
In the instant case, plaintiff's counsel challenged defense counsel's exercise of the peremptory strike against Chatman, with the following argument:
The basis of the Batson challenge is the potential juror's responses. Chrissy Evonne Chatman shows no bias, she knows no parties, she has no knowledge of anything that has happened and it seems that there's an inability to articulate any particular reason for her exclusion other than what seems to be the most apparent, and that's her race. And that's the basis of the Batson challenge.
Defense counsel responded, arguing that although Chatman indicated that she did not know any of the parties or the attorneys, she "looked up and smiled at [plaintiff's counsel] but not at the defense." Defense counsel also stated, "I didn't like that from the beginning, and I haven't liked the way she's responded to questions from either side. And I'm exercising a perempt on her...."
We find that plaintiff failed to meet her burden of making a prima facie showing of discriminatory purpose. Although the reasons for the challenge offered by defense counsel were somewhat superficial, there is nothing to indicate that defense counsel exercised the peremptory challenge on the basis of race. Thus, we find that the trial court did not err in denying plaintiff's Batson challenge.

Defendant's Expert Testimony
Plaintiff also contends the trial court erred in failing to limit or exclude Dr. Hendrix's testimony with regard to the dosing regimen for the drug, Lovenox. Plaintiff argues that because Dr. Hendrix admitted that he did not know the dosing *257 regimen or protocol for using Lovenox to treat pulmonary embolism in the year 2001, he should not have been allowed to testify as an expert witness about the drug.
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise. LSA-C.E. art. 702. A trial judge has much discretion in the determination of whether to accept a witness as an expert, and the decision will not be disturbed on appeal absent an abuse of that discretion. Brantley v. State Farm Ins. Co., 37,601 (La.App.2d Cir.1/28/04), 865 So.2d 265.
In the instant case, Dr. Hendrix was tendered as an expert based upon his "expertise as a medical doctor, board certified internal medicine physician, board eligible nephrologist." During his direct testimony, he did not testify with regard to the dosing regimen for Lovenox in treating patients with pulmonary embolism. He merely explained his basis for prescribing Lovenox to Mr. Wyatt during his hospitalization. He also adhered to his opinion that Mr. Wyatt did not exhibit clear symptoms of an acute pulmonary embolism. The only questions posed to Dr. Hendrix with regard to the use of Lovenox in treating pulmonary embolism were posed by plaintiff's counsel. In response, Dr. Hendrix indicated, in the presence of the jury, that he was unaware of the 2001 dosing regimen for using Lovenox to treat a patient with a pulmonary embolus. This assignment lacks merit.

Testimony Of Dr. Randolph Williams
Plaintiff also contends the trial court erred in refusing to allow Dr. Randolph Williams, Winn Parish Coroner, to testify as an expert in forensic medicine and to testify as to Mr. Wyatt's cause of death in his capacity as a family medicine physician. Plaintiff argues that because Mr. Wyatt's death was a coroner's case, Dr. Williams should have been allowed to testify with regard to his findings and conclusions.
Admissibility of expert testimony in Louisiana is governed by LSA-C.E. art. 702, supra. LSA-C.E. art. 703 provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
LSA-C.E. art. 705(A) provides:
In a civil case, the expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
In Cheairs v. State ex rel. Department of Transp. and Dev., XXXX-XXXX (La.12/3/03), 861 So.2d 536, the Louisiana Supreme Court held that the factors set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), do not apply when determining whether an expert has the proper qualifications to testify. The Court adopted the following three-part inquiry to assist courts in determining the admissibility of expert testimony: (1) whether the expert is qualified to testify competently regarding the matters he intends to address; (2) whether the methodology by which the expert reaches his *258 conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert, supra; and (3) whether the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue.
As stated above, a trial judge has much discretion in the determination of whether to accept a witness as an expert, and the decision will not be disturbed on appeal absent an abuse of that discretion. Brantley, supra. Before an expert opinion can be admitted, the trial court must make "a preliminary assessment that the reasoning or methodology underlying the testimony is scientifically valid," and of whether that reasoning or methodology properly can be applied to the facts at issue. Franklin v. Franklin, XXXX-XXXX (La.App. 1st Cir.12/22/05), 928 So.2d 90. The court must also determine whether the probative value of the expert testimony or opinion would be "substantially outweighed by the danger of" confusion or an undue prejudicial effect on the fact finder. LSA-C.E. art. 403; Franklin, supra. See also State v. Foret, 628 So.2d 1116 (La. 1993); Fussell v. Roadrunner Towing and Recovery, Inc., 99-0194 (La.App. 1st Cir.3/31/00), 765 So.2d 373, writ denied, XXXX-XXXX (La.6/23/00), 765 So.2d 1042.
In the instant case, prior to tendering Dr. Williams as an expert in forensic medicine, plaintiff established that Dr. Williams was board certified in forensic examination. Dr. Williams stated that he had been the Winn Parish Coroner since 1975 and had been qualified as an expert witness in both civil and criminal matters. He also stated that although he did not study forensic medicine in medical school, he had taken courses in areas such as homicide investigation, interrogation and fingerprinting. Dr. Williams distinguished "forensic medicine" from "forensic pathology" as follows:
[Forensic medicine] concentrates more on not the anatomical pathology side of it, but more in terms of the medicine and other kinds of investigations that you do; entomology, botany, trace evidence, that sort of thing, based on medicine rather than strictly anatomical and histological pathology.
Defense counsel objected to the tender of Dr. Williams as an expert in the area of forensic medicine, but he did not object to his testifying as an expert in family practice.[4] The trial court sustained the objection, stating:

*259 [T]he Court does not have sufficient foundation or evidence presented to accept him in forensic medicine. The Court does accept him as an expert in family practice....
We find that the trial court did not err in refusing to allow Dr. Williams to testify as an expert in forensic medicine. Dr. Williams explained the ideology behind forensic medicine, and it is clear from the record that no forensic examination was performed in this case. Dr. Williams testified that he sent an investigator to the emergency room after Mr. Wyatt died. He stated that the investigator viewed Mr. Wyatt's body, reviewed the emergency room records, interviewed Mrs. Wyatt and determined that the death "appeared to be a natural death." No autopsy or any other scientific studies were conducted. Therefore, there is no indication that Dr. Williams was qualified to testify competently regarding forensic medicine in this case. Furthermore, any testimony given would have been merely cumulative of other evidence, as the investigation into the death of Mr. Wyatt consisted only of a review of the medical records and an interview with Mrs. Wyatt. Mrs. Wyatt testified at trial and the medical records were introduced into evidence.
Later in the proceedings, plaintiff's counsel sought to obtain Dr. Williams' opinion with regard to the cause of death in his capacity as a family practitioner. Defense counsel objected and the trial court sustained the objection, stating, in part:
[D]octor Williams was performing his duty as the coroner reported cause of death [sic] within his statutory duty. He was not ... using his credentials as a medical physician to perform this duty to establish a cause of death. The court rules that this opinion is not admissible in this proceeding. The central issue in this civil case before this jury is the cause of death. The plaintiff has [seen] fit to have testimony before the jury that he was the coroner and he does all of these forensic things, and has all of these board certifications in regard to forensics and tothat was to increase or elevate his testimony from being a family physician to being more than that. Which he really is the coroner, so the he was being presented as the coroner. His opinion was formulated as the coroner and the court rules that the prejudice that would bethe prejudice would be outweighed by the allowance of his testimony and therefore, his testifying as a family physician giving his opinion as to the cause of death is not going to be admissible....
We find no error in the trial court's determination that Dr. Williams' testimony with regard to the cause of death would have been prejudicial. Although Mr. Wyatt's death certificate was introduced into evidence, the parties agreed to strike the cause of death from the certificate. It was undisputed that no meaningful examination or autopsy of Mr. Wyatt was performed following his death.[5] This assignment of error lacks merit.

*260 Standard of Care

Plaintiff also contends the jury was manifestly erroneous/clearly wrong in finding in favor of Dr. Hendrix. Plaintiff argues that she met her burden of proving that Dr. Hendrix failed to comply with the appropriate standard of care and that his conduct was more likely than not a cause or factor in the death of Mr. Wyatt.
The manifest error standard applies to our review of medical malpractice cases. Jackson v. Tulane Medical Center Hosp. and Clinic, XXXX-XXXX (La.10/17/06), 942 So.2d 509; Wiley v. Lipka, 42,794 (La.App.2d Cir.2/6/08, 975 So.2d 726), writ denied, XXXX-XXXX (La.5/2/08), 979 So.2d 1284. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Stobart, supra. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La.4/3/02), 816 So.2d 270. "The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." Stobart, supra, at 882.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra. Although the standard of review is high, it does not require this court to abdicate its responsibility to review the trial court's findings, nor does it require this court to affirm a verdict that is manifestly erroneous. Wiley, supra; Gordon v. Willis-Knighton Medical Center, 27,044 (La.App.2d Cir.6/21/95), 661 So.2d 991, writs denied, 95-2776 and 95-2783 (La.1/26/96), 666 So.2d 679. Where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.
The plaintiff bears the burden of proving that a doctor committed medical malpractice. LSA-R.S. 9:2794(A);[6]Wiley, *261 supra. To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. Samaha v. Rau, XXXX-XXXX (La.2/26/08), 977 So.2d 880; Wiley, supra.
In this case, plaintiff introduced the testimony of Dr. Hendrix on cross-examination. Dr. Hendrix testified that the lung scan revealed that Mr. Wyatt suffered from a pulmonary embolism "old or new," but he stated that he did not believe that Mr. Wyatt had an acute pulmonary embolus. He testified that his drug of choice for treating pulmonary embolism was Heparin and stated, "I didn't use Heparin because I didn't think he had an acute pulmonary embolism." Dr. Hendrix admitted that when he prescribed Lovenox to Mr. Wyatt, he did not know the recommended dosing regimen for the treatment of a patient with pulmonary embolism. He also admitted that Mr. Wyatt's INR remained below the therapeutic range throughout his hospitalization. At the request of plaintiff's counsel, Dr. Hendrix read portions of the narrative that he had provided to the medical review panel, in which some of the statements were contrary to his testimony. In one portion of the narrative, Dr. Hendrix stated, "[S]ince pulmonary embolus was considered, [Mr. Wyatt] was started on anticoagulant on admission in the form of Lovenox 30mg twice a day." Later in the narrative, Dr. Hendrix stated, "A V-Q lung scan was performed which confirmed that the patient did indeed suffer from a pulmonary embolus. Coumadin was started at 5mg once a day to treat this pulmonary embolus." Near the end of the narrative, Dr. Hendrix stated, "I believe, under the circumstances, the patient's anti-coagulation for his pulmonary embolus was appropriate in the hospital and as he left."
Plaintiffs also introduced the videotaped deposition of Dr. Melanie McKnight, who served on the medical review panel. Dr. McKnight was accepted as an expert in the fields of internal medicine and nephrology. Dr. McKnight testified that she had reviewed Mr. Wyatt's medical records and the narrative submitted to the medical review panel by Dr. Hendrix. She also stated that she had reviewed the manufacturer's information for Lovenox and Coumadin and had read a medical journal article which summarized some of the guidelines recommended for the treatment of a patient with pulmonary embolism in 2001. In response to questions regarding the treatment of Mr. Wyatt with Lovenox, Dr. McKnight testified:
Well, Lovenox can treat numerous things, and I don't know 100 percent what the Lovenox was used for in this case. It can be used when you suspect a pulmonary embolism prior to a confirmatory test to start treatment. It also can be used in patients who are coming in the hospital sick and would have a potential to develop a blood clot to try to prevent a blood clot from forming.
Dr. McKnight opined that the 30mg of Lovenox prescribed to Mr. Wyatt was insufficient to treat pulmonary embolism. The appropriate dose for treatment of a patient of Mr. Wyatt's weight who suffered from a pulmonary embolus would have been 80mg. She also stated that Lovenox prescribed to treat pulmonary embolism should have been given for a longer period of time, stating, "In treating a pulmonary embolus, it's felt that some sort of Heparin or low molecular weight Heparin blood thinner should be administered for four to five days to ensure that you have adequate anticoagulation or thinning of the blood." *262 Dr. McKnight also testified that the Lovenox should have been continued until Mr. Wyatt's INR reached 2.0. She further testified that the standard for treating a patient with pulmonary embolism required that Coumadin and Lovenox be given simultaneously for a period of time because it takes Coumadin 36 to 72 hours to began to work. In this case, Dr. Hendrix discontinued the Lovenox at the same time that he prescribed the Coumadin.
On cross-examination, Dr. McKnight testified that Dr. Hendrix prescribed antibiotics to Mr. Wyatt to treat pneumonia. She also testified that the care provided to Mr. Wyatt by Dr. Hendrix was appropriate in all aspects with the exception of the treatment with Lovenox. Dr. McKnight noted that the medical review panel determined Mr. Wyatt's cause of death from the death certificate and admitted that it was not medically possible to determine the cause of a patient's death without an autopsy. She also admitted that Mr. Wyatt was at risk for a number of factors that could have caused his death.
During the defense case in chief, Dr. Hendrix was accepted by the court as an expert based upon his "expertise as a medical doctor, board certified internal medicine physician, board eligible nephrologist." Dr. Hendrix testified that Mr. Wyatt was admitted to the hospital with a diagnosis of pneumonia. He stated that Mr. Wyatt provided him with a vague history of pulmonary embolism, but stated that Mr. Wyatt "didn't really remember a lot about it, he just more or less mentioned it in passing." Dr. Hendrix testified that the chest x-ray and physical examination of Mr. Wyatt was consistent with a diagnosis of pneumonia and nothing indicated that he had an acute pulmonary embolus. According to Dr. Hendrix, he and the emergency room physician discussed the case and decided to prescribe Lovenox 30mg to "try to prevent any blood clots from developing in his legs, or anywhere for that matter." He testified that the dosage of 30mg was sufficient for the prevention of blood clot formation. Dr. Hendrix stated that he decided to order the VQ lung scan to follow up on Mr. Wyatt's report that he had a previous history of a blood clot. He also testified that he was not aware of the protocol for treatment with Lovenox in patients with pulmonary embolism at the time that he treated Mr. Wyatt in 2001, because Heparin was his drug of choice for treating pulmonary embolism. He stated that he would have prescribed Heparin, rather than Lovenox, if he believed Mr. Wyatt was suffering from an acute pulmonary embolus. He stated that he decided to place Mr. Wyatt on Coumadin "to get him on some long term anticoagulation." Dr. Hendrix admitted that the radiologist who read the VQ lung scan had opined that Mr. Wyatt had a "high probability for pulmonary embolus" but stated:
[I] didn't feel like he had an acute acute pulmonary embolus. You know, one he was having right at that time. I was going to go ahead and conceive now, yeah, he had ahe had a pulmonary embolus 10 years ago, and we still don't knowstill didn't know why.... I just thought it was a good idea, maybe we just go ahead and put himI can put him on some Coumadin.
He reiterated that he ordered the blood thinners to prevent the formation of blood clots, explaining:
Well, a pulmonary embolus is a blood clot in the lung. A deep vein thrombosis is a blood clot in the legs which can lead to a pulmonary embolus.... If for some reason you develop a deep vein thrombosis in a leg ... in a vein in a leg, it will get larger and larger and as it gets larger it also gets more fragile.... And *263 maybe a piece of it or maybe the whole thing will break off and begin to travel. Well, it's in a vein and as the veins return towards the heart the blood vessel gets larger and larger. It's like a... reverse tree. And so there's nothing to stop it. So it'll, it's going to travel until it gets to the right side of the heart which is where all the veins lead. It goes through the right side of the heart and now it's in the lung. It will travel, now the size of the blood vessels is reverse, it's like a real tree now, an upright tree.... And so as the blood clot moves, it's going to finally reach blood vessel size, it can't go any further, it'll stop right there, it'll lodge right there. And that's a pulmonary embolus.
After hearing the testimony and reviewing the exhibits submitted into evidence, including Mr. Wyatt's medical records and the opinion of the medical review panel, the jury concluded that plaintiff failed to prove the applicable standard of care. Based on a review of the record in its entirety, we cannot say that the jury was manifestly erroneous or clearly wrong. Mr. Wyatt's medical records depicted his overall medical issues, including pneumonia, a history of smoking and some lung issues possibly related thereto. Dr. Hendrix testified at length with regard to his treatment of Mr. Wyatt for pneumonia and reiterated several times that the Lovenox was prescribed to prevent the formation of blood clots, not to treat an acute pulmonary embolus. Dr. McKnight conceded that she was not "100 percent" certain that the Lovenox was prescribed to treat pulmonary embolism. Furthermore, no autopsy was performed and the jury was not presented with the cause of Mr. Wyatt's death as stated on the death certificate. Therefore, we find that the record contains sufficient evidence to support the jury's verdict, and we find no error in the jury's failure to find that the plaintiff proved the applicable standard of care or its failure to ascribe the administration of Lovenox as a causative factor in Mr. Wyatt's death.

CONCLUSION
For the reasons set forth herein, the judgment of the trial court is affirmed. Costs of the appeal are assessed to the plaintiff, Hazel M. Wyatt.
AFFIRMED.
BROWN, J., concurs with written reasons.
BROWN, Chief Judge, concurring,
This was a civil malpractice case against a local physician in a rural parish. The plaintiffs asked for a jury trial. Although some of the challenges for cause may have had merit, I cannot say the trial was untrustworthy. Further, Dr. Williams should have been allowed to testify as an expert witness. Whether he had a sufficient basis or foundation from which to reach certain conclusions was a question of admissibility or credibility; however, I agree that the ruling under the circumstances was harmless.
The issue in this case was not whether plaintiffs proved the standard of care but whether the standard of care was breached. Defendant testified that Mr. Wyatt was suffering from and treated for pneumonia. He further testified that there was no evidence of a deep vein thrombosis or acute pulmonary embolism at Mr. Wyatt's admission. The jury agreed. This verdict was within their wide discretion.
NOTES
[1] The medical records indicate that Mr. Wyatt had been seen at the emergency room on August 5, 2001 with the same complaint.
[2] Griffin first stated that Dr. Hendrix's "stepfather is my first cousin." He later stated, "[My] wife is his stepmother's first cousin."
[3] We must also note that the trial court denied a defense challenge for cause with regard to prospective juror, Resa Jones Johnson. Johnson stated that she knew Mr. Wyatt and that he was the father of her brother-in-law.
[4] Defense counsel objected to the tender of Dr. Williams in the area of forensic medicine, arguing:

[M]y concern is I'm not familiar with the designation of forensic medicine. I do know about forensic pathology. I've not encountered forensic medicine as a designated area of expertise. I may just be, you know, mymy shortfall there, but I have not. And therefore I object to the tender in that regard. Obviously, Doctor Williams is a medical doctor, and so practices. I have no problem with his family practice designation and the fact that he's the coroner of this parish. But I do object to the tender of forensic medicine.
However, contrary to defense counsel's arguments, forensic medicine is not a novelty in civil and criminal matters in Louisiana. Physicians have been accepted as expert witnesses in the field of forensic medicine by a number of courts in this state. See, State v. Kennedy, XXXX-XXXX (La.5/22/07), 957 So.2d 757, rev'd on other grounds by Kennedy v. Louisiana, ___ U.S. ___, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); State v. Maise, XXXX-XXXX (La.1/15/02), 805 So.2d 1141; Edwards v. Sawyer Indus. Plastics, Inc., 99-2676 (La.6/30/00), 765 So.2d 328; State v. McGuffie, 42,536 (La.App.2d Cir.9/26/07) (unpublished), writ denied, 2007-2232 (La.4/4/08), 978 So.2d 325; Williams v. Taylor, 35,299 (La.App.2d Cir. 12/5/01), 803 So.2d 268; State v. Borden, 2007-396 (La.App. 5th Cir.5/27/08), 986 So.2d 158; State v. Jenkins, XXXX-XXXX (La.App. 1st Cir.11/2/07), 2007 WL 3407000 (unpublished), writ denied, XXXX-XXXX (La.5/30/08), 983 So.2d 896; State v. Nolan, XXXX-XXXX (La.App. 3d Cir.9/29/04), 882 So.2d 1246; State v. Bernard, XXXX-XXXX (La. App. 4th Cir.4/2/03), 844 So.2d 1001.
[5] We also point out that Dr. Williams was clearly reluctant to testify as a family practitioner. After reading his statutory duties as a coroner into the record, Dr. Williams stated, "I have no intention of coming in here and rendering an opinion...." He indicated that he would offer no testimony as an expert in family medicine; only in his capacity as coroner.
[6] LSA-R.S. 9:2794(A) provides:

A. In a malpractice action based on the negligence of a physician ..., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.